IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| JEWEL HUNTER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:09cv1155-MHT |
| | ) | (WO) |
| SANTA FE PROTECTIVE | ) | |
| SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

The plaintiffs, who applied for security-guard positions with defendant Santa Fe Protective Services, Inc., bring this lawsuit on behalf of themselves and all others similarly situated, charging that Santa Fe discriminated against them on the basis of age, in violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621-634.[1] The plaintiffs assert

_____

    1.  The plaintiffs are Jewel Hunter, Carol Adams, Judith Dashner, Karen Didorek, Marilyn Revalee, Eddie Bradshaw, Linda Forbes, Huie Infinger, William Tharpe, John Thompson, William Dover, Cynthia O'Bryant, Melanie Griffith, John H. Crawford, Jr., Gregory Davis, and Amy J. Hanbury.  Plaintiff Infinger died after this lawsuit was filed; his claims are therefore being pursued by
(continued...)

both 'disparate treatment' and 'disparate impact' claims. Jurisdiction is proper under 29 U.S.C. § 626(c).

This lawsuit is now before the court on Santa Fe's motion for summary judgment on both of the plaintiffs' claims and on the plaintiffs' motion for partial summary judgment on their disparate-impact claim. Summary judgment is warranted if, after viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in their favor, the court is convinced "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). For the reasons that follow, Santa Fe's motion will be granted and the plaintiffs' motion will be denied.

---

1(...continued)
Estelle Imfinger, as administratrix of his estate.

## II.  BACKGROUND

On April 17, 2009, the Army awarded Santa Fe a contract to provide security services at Fort Rucker, Alabama.   That contract had previously been held by Clifton Dates & Associates, Inc. (CDA).  Santa Fe decided to hire as many of the existing CDA guards as possible to fill the 135 full- and part-time security-guard positions at Fort Rucker.  Accordingly, Santa Fe held meetings with the CDA guards to tell them about the contract and its requirements, and it sent follow-up letters to the guards that made conditional offers of employment with the company.  By June 1, 2009, an applicant was required to meet four conditions: pass a background check, pass a physical-agility test (PAT), obtain firearm certification, and  qualify to use pepper spray and carry a collapsible baton.

This litigation focuses on the 2006 PAT that was part of AR 190-56, an Army regulation covering the Civilian Police and Security Guard Program.   After years of

3

unclear physical-agility standards, AR 190-56 was significantly revised to include the PAT in 2006. Since 2006, the Army, through AR 190-56, has required contractors to send out conditional employment notices that include a description of the current PAT, see AR 190-56, at App'x B (Doc. No. 49-3, at 27-30); all of the plaintiffs signed the conditional employment letter. Like the adoption of other administrative rules, the 2006 PAT was the result of a multi-year process. Efforts began in the mid-1990s but were abandoned. New emphasis on standardizing physical-agility tests began following "September 11, 2001," and the commander-in-chief's decision to deploy more Army personnel, including those serving as military police at Army bases, overseas as a part of his war-waging efforts; when active-duty troops were "needed in the war fight" the army "mobilized reservists," but when reservists were also deployed, the Army decided to hire private, contract security guards to staff its installations. Loe Dep. (Doc. No. 49-1, at 20-

4

21).   The Army's Office of the Provost Marshal General developed the 2006 PAT, and Physical Security Specialist Michael Loe took the lead in drafting the regulation.   To do so, Loe met with senior Army officials (for example, the Army's Surgeon General and physical-fitness experts from the Army Military Policy School); conducted a three-day "working group" in 2004 involving 30 representatives from various Army commands; and consulted aerobic-fitness standards for law-enforcement personnel that had been validated by an outside group.   In April 2005, Loe completed a full draft of the 2006 PAT and submitted it to the working group.   After incorporating the group's comments, Loe sent the draft to legal officers and up the chain-of-command.   The 2006 PAT was published September 27, 2006.

Though there were changes to the entire AR 190-56 regulation (like the requirement of conditional employment statements), only the 2006 PAT requirements are relevant here: the PAT required security guards to

5

complete 29 sit-ups in two minutes, a 300-meter sprint in 81 seconds, 21 push-ups in two minutes, and a one-and-a-half mile run in under 17 minutes and 30 seconds.  The 2006 PAT differed from the physical-fitness requirements CDA guards had been required to pass under their contract with the Army.  CDA guards had had to pass a fitness test consisting of 21 sit-ups in two minutes, 21 push-ups in two minutes, and a one-mile run in less than 12 minutes. Women were permitted to perform the push-ups on their knees.  The CDA physical-fitness test had been administered annually in October, and all of the plaintiffs had passed it in 2008.

After the amendments to AR 190-56 went into effect, the Army received complaints from congressional representatives that the 2006 PAT requirements were too stringent.  In response, the Army decided to consider revising AR 190-56 again.  On March 20, 2008, before Santa Fe assumed the contract at Fort Rucker, the Provost Marshal General issued a memorandum regarding the

upcoming revisions to AR 190-56.  In the memorandum, the Provost Marshal General "request[ed] commands not take adverse personnel actions on employees who do not pass the record PAT in the current AR," Provost Marshal Memo. (Doc. No. 57-3) at 1; the 2008 memorandum also requested that "Contracting Officers' Representatives notify contractors of the Army position on this issue." Id.

Santa Fe's contract does not include the 2008 memorandum; instead, the contract contained a Performance Work Statement (PWS) that said all Santa Fe security guards "shall meet the medical and physical requirements outlined in AR 190-56." PWS § 1.4.7.1 (Doc. No. 52-5), at 3.  The PWS also stated that "Personnel that fail the pre-assignment or the annual PAT qualification requirements shall not be used on this contract until the employee meets the requirements." Id. § 1.4.10.1.

These provisions were in the contract because the Army's contracting officer for Fort Rucker, Lee Rentfrow, required them as he negotiated the contract with Santa

Fe's Vice President of Business Operations, Mark Liming.
Rentfrow was bound to include these requirements in the
contract in order to comply with AR 190-56, and the
negotiations between Rentfrow and Liming reflect the
general policy of the Army with respect to using private
contracts at military installations: the Army will
designate a contracting officer, guided by the Army's
regulations, to negotiate a particular contract for the
needs of a certain base.  The contracting officer, while
bound to Army regulations, also has significant authority
and discretion when negotiating a contract, and typically
oversees the implementation of contracts by monitoring
and assisting in various administrative tasks, such as
supervising worker hiring.

Working with Rentfrow, Liming created a transition
team to oversee the security-guard-hiring process, which
the two devised in April 2009 and was described in the
conditional-offer letters.  Liming first hired Joseph
Gentz, a non-CDA employee, as the Program Manager or

8

'Chief of Guards,' which is the highest-ranking civilian post at the base.  Liming then hired Frank Gorski, another non-CDA employee, to be the Deputy Program Manager or 'Deputy Chief.'  From there, Liming and his team implemented the process described in the conditional employment letter.

All prospective employees had to get a physical and then be medically cleared to ensure that they were able to take the 2006 PAT.  Once applicants obtained medical clearance, they were scheduled to take the PAT.  Upon passing the 2006 PAT, applicants moved through the next steps in hiring: a more comprehensive medical exam, additional training and certification, an interview, and the completion of other paperwork.  Applicants who failed any part of the PAT, however, could not attempt the other portions of the test and did not go on to the next stage in the hiring process.  Though applicants were given multiple opportunities to take the PAT (which had to be within 30 days of their medical clearance), the

implementation date of June 1, 2009, was effectively the final date for CDA guards.  These guards could retake the 2006 PAT after June 1st at one of three scheduled times in June, but, per an agreement between Santa Fe and the security guards' union, they would not be guaranteed an immediate job at the Fort; they would be "assimilated back into the workforce" in an "expedient manner." Memorandum of Agreement, at 3 (Doc. No. 74-1).

Two of the plaintiffs, Carol Adams and Melanie Griffith, were not medically cleared to take the PAT and thus did not take it.  The remaining plaintiffs all attempted the PAT but were unable to pass it.  Six of the plaintiffs (John Crawford, Linda Forbes, Amy Hambury, Jewel Hunter, Huie Infinger, and Cynthia O'Bryant) attempted the PAT multiple times but failed each time. All of the plaintiffs were incumbent security guards at Fort Rucker when Santa Fe took over the contract, and all of them were over 40-years old at the time.  All of the security guards Santa Fe hired passed the 2006 PAT.

10

### III. DISCUSSION

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff can make out a claim for age discrimination under disparate-treatment or disparate-impact theories of liability. In a treatment case, "[t]he employer simply treats some people less favorably than others because of their [age]. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." Hazen Paper Co. v. Biggins, 507 U.S. 604, 609 (1993) (internal quotes and citation omitted). Impact claims, however, "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another"; proof of discriminatory motive

is unnecessary.  Id.  The plaintiffs here allege that
Santa Fe's failure to hire them was the result of
discrimination in both its disparate-treatment and
disparate-impact forms.

### A. Disparate Treatment

#### 1.

While it may in some instances be possible to show
disparate treatment through direct evidence of
discrimination, plaintiffs are most often left with
circumstantial evidence to prove that they are the
victims of illegal discrimination.  When circumstantial
evidence is used, the court looks to the burden-shifting
framework of McDonnell Douglas Corp. v. Green, 411 U.S.
792 (1973).  See, e.g., Chapman v. AI Transport, 229 F.3d
1012, 1024 (11th Cir. 2000).  Under McDonnell Douglas,
the plaintiffs must first make out a prima-facie case of
age discrimination.  Once the plaintiffs have done so, a
presumption of age discrimination arises, and the burden
shifts to the employer to "articulate a legitimate,

nondiscriminatory reason for the challenged employment action." Id. This is a burden of production only; the employer need not persuade the finder of fact that the proffered reason was the actual motivation for its actions. Id. (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981)). Once the employer satisfies its burden of production, the presumption of discrimination is eliminated and the burden shifts back to the plaintiffs to produce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Id. Because the ultimate burden of proof rests at all times with the plaintiffs, the employer is entitled to summary judgment if the plaintiffs fail to provide sufficient evidence to create a genuine issue of material fact as to whether each of the employer's proffered reasons is pretextual. Id. at 1025.

A plaintiff can make out a prima-facie case of age discrimination by showing that she "(1) was a member of

13

the protected age group, (2) was subjected to adverse
employment action, (3) was qualified to do the job, and
(4) was replaced by or otherwise lost a position to a
younger individual." Id. at 1024. Here, the parties
dispute only whether the plaintiffs were qualified for
the position of security guard. According to Santa Fe,
"Because passing the PAT was a condition of employment
with Santa Fe and Plaintiffs failed the PAT, they were
not qualified to work as Santa Fe security guards at Fort
Rucker." Def.'s Mot. at 39 (Doc. No. 48). The
plaintiffs counter that "they were actually qualified to
perform the duties of a security guard at Fort Rucker,"
Pls' Resp. at 36 (Doc. No. 56) (emphasis original),
because they had all been performing the required job
duties and tasks for several years. The court agrees
that the plaintiffs' long tenure as security guards is a
sufficient indicium of qualification under McDonnell
Douglas. See Damon v. Fleming Supermarkets of Florida,
Inc., 196 F.3d 1354, 1360 (11th Cir. 1999) ("Our
precedent holds that if a plaintiff has enjoyed a long

14

tenure at a certain position, we can infer that he or she is qualified to hold that particular position.").

In response to the plaintiffs' prima-facie case, Santa Fe gives a non-discriminatory reason for not hiring them: the plaintiffs did not pass the 2006 PAT. Santa Fe says that its contract with the Army required that all applicants for security-guard positions take and pass the 2006 PAT and that the plaintiffs here either did not take it because they were not medically cleared to do so or they took it but failed. This reason satisfies Santa Fe's burden of production.

As a consequence, the burden now shifts back to the plaintiffs to show that Santa Fe's given reason is pretextual. A plaintiff may meet this burden by persuading the court that a discriminatory reason "more than likely motivated the employment decision or by demonstrating that the proffered reason for the employment decision is not worthy of belief." Gray v. City of Montgomery, 756 F. Supp. 2d 1339, 1345 (M.D. Ala. 2010) (Thompson, J.) (citing Burdine, 450 U.S. at 256)

15

(emphasis added).  The plaintiffs here have proceeded under the second method for demonstrating pretext--that is, by demonstrating the employment decision is "not worthy of belief"--which may be accomplished by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered explanation.  Id. (quotes and internal citation omitted).  That being the case, however, the plaintiffs are "not allowed to recast an employer's proffered nondiscrimiatory reasons or substitute [their] business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, [the plaintiffs] must meet the reason head on and rebut it, and the [plaintiffs] cannot succeed by simply quarreling with the wisdom of that reason." Champan, 229 F.3d at 1030.

Here, the plaintiffs rely primarily on three purported weaknesses in Santa Fe's given reason for its actions: (1) the March 2008 Army memorandum revised the contract and indicated that the 2006 PAT should not be

used to make employment decisions; (2) Chief of Guards
Joe Gentz and Deputy Chief of Guards Frank Gorski did not
have to take the 2006 PAT; and (3) Gentz made a comment
indicating discriminatory animus against older workers.

2.

The parties spend much of their briefing disputing
whether the March 2008 memorandum had any effect on Santa
Fe's contract with the Army.  The plaintiffs refer to the
memorandum as a "policy document" that amended or
supplemented AR 190-56 and therefore altered the terms of
Santa Fe's contract with the Army; Santa Fe responds that
the memorandum was not part of the contract, that no one
from the Army ever sent the memorandum to Santa Fe, and
that only contracting officers (not the Provost Marshal
General) have the authority to set or change contract
requirements.

The court rejects the plaintiffs' approach to this
dispute.  At bottom, the plaintiffs appear to view the
dispute as contractual: if the Army's contract with Santa

17

Fe did not incorporate the 2006 PAT, the plaintiffs win; if the contract did, Santa Fe wins.  But the disparate-treatment claim is not a simple contract dispute; the claim turns instead on motive.  The appropriate question is not whether the March 2008 memorandum actually changed Santa Fe's contract with the Army or even whether it should have changed Santa Fe's behavior under the contract; instead, for purposes of ferreting out discrimination, the question is whether Santa Fe's interpretation of the contract was reasonable or was so unreasonable that a discriminatory motive may be inferred.  The Eleventh Circuit Court of Appeals has emphasized that: Courts "do not sit as a super-personnel department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere.  Rather [the] inquiry is limited to whether the employer gave an honest explanation of its behavior." Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th

Cir. 1991) (internal quotes and citation omitted); <u>see also</u> <u>Cofield v. Goldkist, Inc.</u>, 267 F.3d 1264, 1269 (11th Cir. 2011) (per curiam).  The plaintiffs may show that Santa Fe's interpretation was unreasonable from the language in the documents at issue and from the parties' conduct.

First, the record is totally devoid of evidence that in other, similar instances Santa Fe has acted differently.  For example, there is no evidence that, when confronted with a similar contract in similar circumstances involving PAT requirements, Santa Fe has interpreted that contract in a manner inconsistent with the way it has interpreted the contact at issue here.

Second, the plaintiffs have not demonstrated that Santa Fe's interpretation of its contractual obligations with the Army was unreasonable.  It is undisputed that the contract between the Army and Santa Fe required passage of the 2006 PAT; that contracting officer Rentfrow told Santa Fe it should make passage of the PAT a condition of employment and that he oversaw this

19

process; and that the conditional employment letters, signed by all of the plaintiffs, were explicit about treating the PAT as a prerequisite for employment. Indeed, adopting the contracting officer's terms, for all intents and purposes, was a prerequisite of the contract: if Santa Fe refused to follow the Army's regulations it would not likely have been given the contract in the first place.

Third, Santa Fe's view of the Provost Marshal's memorandum as non-binding is reasonable. For starters, the memorandum was not formally included or appended to Santa Fe's contract. Next, as explained below, the language of the memorandum itself, the testimony of its drafter, and additional documents in the record submitted by the plaintiffs all confirm that the March 2008 memorandum did not modify the contract between Santa Fe and the Army.

By its terms, the "purpose" of the March 2008 memorandum was to "provide guidance" to commands regarding applicants who did not pass the PAT. 2008

Memorandum (Doc. No. 57-3) at 1.   This guidance was needed, the memorandum continues, because the regulation was in the process of "major revision and [was to] be fielded for review and comment in the coming weeks."  Id. The result of this process, the memorandum advised, would be a new PAT with similar, though slightly looser, physical requirements and, more significantly, an exception for "temporary medical restrictions for those who are unable to take the PAT or certain PAT events." Id.

The advisory effect of the memorandum is clear in the paragraph that follows the "purpose" statement:  The paragraph uses the word "request" four times and ends with a "recommendation."  Specifically, the memorandum "request[ed] commands not to take adverse personnel actions on employees who do not pass the record PAT in the current AR" and further "request[ed] this restriction remain in effect until the revised regulation is published."  Id. (emphasis added).  The memorandum also "request[ed] ... Contracting Officers ... [to] notify

21

contractors of the Army position" and to avoid any future inconsistencies between the PWS (which is part of a contractor's contract and incorporates AR 190-56) and AR 190-56 itself; and the memorandum "request[ed] elimination of the specific PAT standards in PWS and instead recommend[ed] language requiring compliance with the PAT standards contained in the most current version of AR 190-56." Id. (emphasis added). If the memorandum actually changed Santa Fe's contract such hortatory language would be unnecessary; the contract would have just been changed.

Next, Joseph Kamide, the Army official who drafted the memorandum, confirmed that it "was a request to commanders, it wasn't a directive." Kamide Dep. 47:5-11 (Doc. No. 52-4). Kamide also clarified the role of the Provost Marshal General's relationship to Army policy and contracting officers: The Provost Marshal General, as an "Army staff principal, not a commander," publishes policy; is not involved in actual contracting; and does not dictate to contracting officers what to put in or

22

keep out of a specific contract.  <u>Id</u>. at 67-68.  In
contrast, contracting officers like Rentfrow (not the
Provost Marshal) negotiate individual contracts and
monitor compliance with Army directives.  Contracting
officers, therefore, have discretion when implementing
contracts and need not follow every policy preference of
the Provost Marshal, unless that policy preference has,
for some reason, been turned into the force of a rule by
being actually incorporated into the Army regulations or
other formal documents, like the PWS.  Kamide emphasized
that, given the role of the Provost Marshal's office and
given the reason for sending interim "guidance" to those
who made contracts that would ultimately be subject to
any official changes to AR 190-56, the March 2008
memorandum was "not an order" but rather was "a request."
<u>Id</u>.

Next, the plaintiffs have failed to point to any
evidence in the record that could reasonably support the
inference that the March 2008 memorandum modified Santa
Fe's contract.    The plaintiffs point to general

descriptions of the Office of the Provost Marshal, as
outlined in the PWS and in AR 190-56; several times in
their briefs and again at oral argument, the plaintiffs
point to documents describing the office of the Provost
Marshal generally. Regulations define the
responsibilities of the Provost Marshal as the officer
who "will develop policies, standards, and procedures to
enhance the overall effectiveness of" the Army Civilian
Police and Security Guard Program. AR 190-56 § 1.4a
(Doc. No. 49-3, at 8). The problem for the plaintiffs,
however, is that merely describing the Provost Marshal's
job in the abstract does not transform an advisory
memorandum into a contract alteration or binding
regulation itself, and it does nothing to change the fact
that the Provost Marshal does not have the power to
change or negotiate individual contracts with private
companies like Santa Fe. When regulations, like AR 190-
56, are actually formally revised (a process that the
Provost Marshal controls), these regulations are
incorporated into the PWS of a particular contract; a

24

non-binding piece of "interim guidance," however, is not. Kamide Dep. (Doc. No. 52-4, at 70).

Finally, any remaining doubts about the plaintiffs' inability to show pretext here are put to rest by the clear language of the Memorandum of Agreement (MOA) signed by Santa Fe and the United Government Security Officers of America Local #401 (Local #401), which is the union for the security guards. The "purpose" of the MOA was "to set forth the agreed upon procedure for implementation" of the 2006 PAT requirements. Memorandum of Agreement, at 2 (Doc. No. 74-1). This agreement, signed well-after the March 2008 memorandum was written, leaves no room for factual dispute about how Santa Fe and the union contemplated the contract would be implemented.

The MOA first defines Santa Fe as the "'Successor Employer' for the provision of uniformed guard and security guard services" at Fort Rucker, and defines Local #401 as "the exclusive bargaining agent for the unit of non-supervisory guards who were employed by CDA."

<u>Id</u>.  The MOA then identifies the AR 190-56's PAT, that

is, the 2006 PAT, as the governing standard:

> "Santa Fe[] desires to hire many of the guards within the bargaining unit to work for it under its new contract with the U.S. Army.  As the Union is aware, however, employment with Santa Fe[] is subject to and contingent upon the successful completion by an applicant for employment of the passing of the Physical Agility Test ('PAT') Army Regulation AR 190-56.  The failure to successfully complete the 'PAT' makes an individual ineligible for employment.  The failure of an employee to successfully complete the 'PAT[]' will subject the applicant to termination."

<u>Id</u>.  The MOA then sets forth a schedule of PAT dates

after the full-implementation date of June 1, 2009, and

provides that, "Bargaining unit members who successfully

complete the ... process will be assimilated back into

the workforce."  <u>Id</u>. at 3.  But, if

> "the bargaining unit member is unable to
> successfully complete the 'PAT,' the
> bargaining unit member will be deemed to
> have failed to meet the essential
> requirements of the position and his or
> her contingency offer of employment will
> be terminated.    A failure to
> successfully complete the 'PAT' will be
> considered just cause for termination
> from employment."

Id. at 4.

By its plain language, therefore, the MOA
contemplates adverse-employment action as a result of
failing the 2006 PAT.  That the union, which served as
the plaintiffs' exclusive bargaining unit, also
recognized that failure to pass the 2006 PAT would
inevitably have adverse-employment consequences supports
strongly Santa Fe's understanding of its obligations
under its contract with the Army as being reasonable.

For the above reasons, the court is convinced that a
reasonable factfinder would have to conclude that Santa
Fe's interpretation of its contract was reasonable.
Moreover, even if the question were, as argued by the
plaintiffs, whether Santa Fe's interpretation was

actually correct, the court would have to conclude, for the above reasons, that a reasonable factfinder would have to answer yes.

3.

The fact that Gorski and Gentz did not have to take the 2006 PAT is insufficient to establish pretext. Santa Fe argues that Gorski and Gentz are not similarly situated to the plaintiffs because they were supervisors and because "supervisors and their subordinates are not proper comparators for purposes of a disparate treatment claim." Def.'s Mot. at 42 (Doc. No. 48) (citing <u>Mathis v. Wachovia Bank</u>, 255 F. App'x 425, 431 (11th Cir. 2007)). The plaintiffs respond by pointing out that there is no distinction between supervisors and security guards in the PWS, at least not in terms of whether one group is required to pass the PAT and another group is not. <u>See, e.g.</u>, AR 190-56 at App'x G-2 (Doc. No. 49-3)("Physical agility testing is applicable to all

28

contract or contractor guard personnel and will be included in the SOW/PWS.").

In the end, however, four undisputed facts make this "exception" insufficient to demonstrate pretext here. First, as described above, Lee Rentfrow was the Army's contracting officer in charge of implementing the contract. That Rentfrow knew Gentz and Gorski had not taken the PAT and that he worked with them to implement the requirement for the security guards demonstrates that he--along with Liming--did not think the PAT requirement applied to the Program Manager and his Deputy, Gentz and Gorski. Again, the relevant question is not one of contract interpretation, but rather whether Santa Fe's purported reason for not hiring the plaintiffs was unreasonable. Rentfrow's ratification of this "exception" is evidence that the Army, regardless of the vague terms of the PWS, understood the agreement in the same way as did Santa Fe.

Second, as further evidence that even the plaintiffs understood there to be a distinction between security

guards and supervisors as related to passing the PAT, the
MOA between Local #401 and Santa Fe refers only to "non-
supervisory guards" and contemplates that failing the PAT
would result in termination for these guards only.

Third, as Santa Fe emphasizes, there are tangible
differences between security guards' duties,
responsibilities, treatment, and even history and those
of the Chief of Guards and his deputy.  Recall, for
example, Gentz and Gorski were not former CDA employees;
more saliently, Gentz and Gorski do not perform even
remotely the same functions as security guards, a fact
which the plaintiffs do not dispute.  These differences
make Gentz and Gorski poor comparators for the purpose of
finding discrimination.  As the Eleventh Circuit has
recognized, the "comparator must be nearly identical to
the plaintiff to prevent courts from second-guessing a
reasonable decision by the employer."  Wilson v. B/E
Aerospace, Inc., 376 F.3d 1079, 1091 (11th th Cir. 2004).

Fourth and perhaps most compellingly, even if Gorski
and Gentz were adequate comparators, cf. Lathem v. Dep't

30

of Children and Youth Servs., 172 F.3d 786, 792-93 (11th
Cir. 1999) (finding a supervisor and lower-level employee
similarly situated because they were subject to the same
discipline   and   employment   policy),   the   plaintiffs'
attempt to show pretext for age discrimination falters
because Gorski and Gentz were both over the age of 40
when they were hired.   Indeed, that Santa Fe exempted
these   two   over-age-40   employees   from   the   2006   PAT
dramatically demonstrates that the motive behind the PAT
was not age.

The court holds that a reasonable factfinder would
have to reject the plaintiffs' reliance on the Gorski and
Gentz exception as evidence of age discrimination.


4.


Finally, the plaintiffs have provided evidence of an
age-biased comment made by Gentz, a Santa Fe official.
According to the plaintiffs, Gentz said the following to
plaintiff Crawford while he was preparing to take the
PAT: "Don't you think you are a little old for this?

Don't you think you should be doing something else?"
Crawford Aff. ¶ 7 (Doc. No. 57-6).   This comment,
however, does not do the work the plaintiffs need.

The plaintiffs' claim is that Santa Fe's decision to
require the 2006 PAT as a condition of employment,
despite the March 2008 memorandum, was discrimination on
account of age.   The problem with relying on Gentz's
comment, however, is that the decision to require the PAT
as a condition for employment was made by Santa Fe in
April when Liming met with Rentfrow to discuss the
contractual requirements, a meeting that was before
Liming hired Gentz.   See, e.g., Liming Dep. (Doc. No. 49-
7, at 102) ("I had a meeting with the contract officer on
the last day of April, of 2009, at which time ...
contractual requirements were discussed.   And at that
time, he informed me, and reiterated, that the AR 190,
dated September of '06, was the standard for the PAT.").
It is also undisputed that Gentz had no role in adopting
Santa Fe's position about whether to use the CDA's old
physical fitness test, the 2006 PAT, or anything other

32

condition for employment.  Cf. Gentz Aff. ¶ 4 (Doc. No.
52-7). ("Although I helped administer the PAT for Santa
Fe, I had no input into Santa Fe's hiring decisions.").
As AR 190-56 bears out, the Army required the 2006 PAT,
which is why it was included in the contract.  Thus, the
problem for the plaintiffs is that Gentz had no role in
the decision to use the 2006 PAT and that, as a result,
his bias (as reflected in his age-biased comment) cannot
be assigned to Santa Fe.


                        5.

    In conclusion, for all of the above reasons, the
court holds that Santa Fe is due summary judgment in its
favor because a reasonable factfinder would have to
conclude that the company did not discriminate against
the plaintiffs because of their age.


                        33

## B. Disparate Impact

The plaintiffs' second claim is that the use of the 2006 PAT violated the ADEA because the requirement had a disparate impact on applicant-guards over age 40. "[T]o state a prima facie case of disparate impact discrimination, a plaintiff must establish that (1) there is a significant statistical disparity among members of different [age] groups; (2) there is a specific, facially-neutral employment policy or practice; and (3) there is a causal nexus between the specific policy or practice and the statistical disparity." Cooper v. Southern Co., 390 F.3d 695, 724 (11th Cir. 2004) (overruled on other grounds by Ash v. Tyson Foods, Inc., 546 U.S. 454, 456-57 (2006) (per curiam)). However, because "age, unlike race or other classifications protected by Title VII [of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e through 2000e-17], not uncommonly has relevance to an individual's capacity to engage in certain types of employment," Smith v. City of Jackson, Miss., 544 U.S. 228, 240 (2005), disparate-

34

impact liability under the ADEA has a narrower scope than that under Title VII.  Id.

As a result, the ADEA includes an affirmative defense "permitting any 'otherwise prohibited' action 'where the differentiation is based on reasonable factors other than age,'" id. (quoting 29 U.S.C. § 623(f)); thus, an employer is not liable for age discrimination as long as it can show that the adverse impact is attributable to a reasonable factors other than age.  The employer bears both the burden of production and of persuasion as to the reasonableness of its choices.  Meacham v. Knolls Atomic Power Lab., 554 U.S. 84, 93-94 (2008).  Although the precise contours of what amounts to a reasonable factor other than age were not thoroughly described in City of Jackson or Meacham, one very important point is clear: the 'reasonable factor' test requires a showing less stringent than the 'business necessity' test that is applicable to other types of employment-discrimination

claims.[2] "Unlike the business necessity test, which asks
whether there are other ways for the employer to achieve
its goals that do not result in a disparate impact on a
protected class, the reasonableness inquiry includes no
such requirement." City of Jackson, 544 U.S. at 242-43.
Thus, as Meacham put it, the "focus of the defense is
that the factor relied upon was a 'reasonable' one for
the employer to be using," 554 U.S. at 96; as a result,
"certain employment criteria that are routinely used may
be reasonable despite their adverse impact on older
workers as a group." City of Jackson, 544 U.S. at 241.

Here, there is no question that the plaintiffs have
made out their prima-facie case; Santa Fe therefore rests
its motion for summary judgment on the contention that
its use of the 2006 PAT was based on a reasonable factor

---

2.   In fact, because of City of Jackson and Meacham,
the EEOC has issued a notice of proposed rulemaking for
the definition of a "reasonable factor other than age."
Definition of "Reasonable Factors Other Than Age" Under
the Age Discrimination in Employment Act," 75 Fed. Reg.
7212 (Feb. 18, 2010).   Because this rule it is not yet
final, the court has not relied on the EEOC's proposed
definition.

than age: "the Army required Santa Fe to use the test."
Def. Mot. at 21 (Doc. No. 48).[3]  As with their disparate-
impact claim, the plaintiffs respond that, because of the
March 2008 memorandum, it was unreasonable for Santa Fe
to use the 2006 PAT.

As previously discussed, the determination of whether
it was reasonable to use the 2006 PAT is a question quite
distinct from whether the March 2008 memorandum actually
altered the terms of Santa Fe's contract.  For the same
reasons described above, this decision was reasonable
and, at any rate, the March 2008 memorandum did not have
the effect the plaintiffs contend it did.  Restated
briefly, a reasonable factfinder would have find it was
reasonable for Santa Fe to make the 2006 PAT a condition
of employment for the following reasons: the requirement

_____

3.  Santa Fe also argues that this court should not
inquire into the reasonableness of the Army's decision to
institute the 2006 PAT because it is a military judgment
that falls under the political-question doctrine.  Given
that the court finds Santa Fe's decision rests on a
reasonable factor other than age, the court does not
address this issue.

was a part of its contract; Santa Fe negotiated this
contract with Army officer Rentfrow (who had knowledge of
the March 2008 memorandum); and the MOA between the Local
#401 and Santa Fe confirmed that the 2006 PAT was a
condition.  A reasonable factfinder would therefore have
to conclude further that Santa Fe's requirement of the
PAT was a reasonable factor, other than age, that
responded to the Army's contractual requirements.  See
City of Jackson, 544 U.S. at 242 (despite "disparate
impact, ... the City's decision to grant a larger raise
to lower echelon employees for the purpose of bringing
salaries in line with that of surrounding police forces
was a decision based on a 'reasonable facto[r] other than
age' that responded to the City's legitimate goal of
retaining police officers"); Allen v. Highlands Hosp.
Corp., 545 F.3d 387, 406 (6th Cir. 2008) (upholding an
employer's policy that was "not be the wisest method of
running a hospital," but was "a reasonable factor other
than age in response to [the hospital's] bulging employee
costs").

The plaintiffs emphasize that Santa Fe asserts as an affirmative defense that a third-party, the Army, required the company to use the PAT; they argue that the ADEA's affirmative defense does include reliance on third-parties' requirements. The court rejects the plaintiffs' categorical rejection of third-party reliance for the same reason that the court would reject a categorical acceptance of it: There is nothing in the ADEA's language that prohibits or requires acceptance of reliance on third-parties' requirements when put forward as an affirmative defense; rather, because the defense is the presence of a reasonable factor other than age, the applicable question is whether the reliance on third-party requirements was reasonable under the specific circumstances presented. Here, the question, therefore, is whether Santa Fe's reliance on the Army's adoption of the 2006 PAT was reasonable. For the reasons given above, the court concludes that a reasonable factfinder would have to find it was.

Moreover, even if the focus were not on whether it was reasonable for Santa Fe to rely upon the Army's PAT but instead on whether the testing standards are themselves reasonable, the conclusion would be the same. First, a reasonable factfinder would have to conclude that requiring a physical-agility requirement in general was reasonable. It is undisputed that the Army developed the 2006 PAT to respond to staffing concerns given international war-waging efforts that escalated after "September 11, 2001." Second, a reasonable factfinder would have to reach the same conclusion for the 2006 PAT in particular. The PAT was the product of an extensive and comprehensive process: As explained, Physical Security Specialist Loe met with senior Army officials (including, the Army's Surgeon General and physical-fitness experts from the Army Military Policy School); conducted a three-day "working group" in 2004 involving 30 representatives from various Army commands; consulted aerobic fitness standards for law-enforcement personnel that had been validated by an outside group; after

completing a full draft of the new AR 190-56, submitted it to the working group; and then, after incorporating the group's comments, sent the draft to legal officers and up the chain-of-command.

The plaintiffs also argue that Santa Fe's reliance on the 2006 PAT was unreasonable because it was not 'validated,' that is, subjected to "the process of determining whether a selection device is sufficiently job-related to comply with the requirements of Title VII." Ensley Branch of NAACP v. Seibels, 616 F.2d 812, 816 n. 11 (5th Cir. 1980). While validation would be one means to show that an employment requirement was reasonably relied upon despite adverse impact (and indeed, validation may be needed depending on the test and the particular circumstances of its use), the court is unaware of any provision in the ADEA categorically requiring validation before an employer may be found to have reasonably relied on a test.  Here, although there was no validation specifically aimed at Santa Fe's use of the 2006 PAT in hiring security guards, the court is

convinced that a reasonable factfinder would have to conclude, under the particular circumstances presented here (the extensive and comprehensive process that led to the PAT) and for the reasons given above, that Santa Fe's use of the PAT was still reasonable.

The plaintiffs further observe that, in 2009, a newer version of AR 190-56 was published; that "The new standards are much less stringent, included fewer events and provided for alternative exercises and temporary medical waivers"; and that, "Since the new AR 190-56 has been in place, security guards have not been terminated for failing the PAT." Plaintiffs' Resp. in Opp. to Def.'s Mot.for Sum. Jud. (Doc. No. 56) at 33. The court's response to this observation is simple: "While there may have been other reasonable ways for the [Army] to achieve its goals, the one selected was not unreasonable. Unlike the business necessity test, which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry

includes no such requirement." <u>City of Jackson</u>, 544 U.S. at 243.

***

For the above reasons, the plaintiffs have failed as a matter of law to establish their ADEA disparate-treatment and disparate-impact claims. Santa Fe's motion for summary judgment will be granted on both of the plaintiffs' claims, and the plaintiffs' motion for partial summary judgment on their disparate-impact claim will be denied.

An appropriate judgment will be entered.

DONE, this the 25th day of October, 2011.

<u>   /s/ Myron H. Thompson   </u>
UNITED STATES DISTRICT JUDGE